# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **BRADLEY SCOTT HEINTZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-CV-00195-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Bradley Scott Heintz appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1]  (*See* DE 1).  For the

following reasons, the Commissioner's decision will be REVERSED, and the case will be

REMANDED to the Commissioner for further proceedings in accordance with this Opinion and

Order.

## I.  PROCEDURAL HISTORY

Heintz applied for DIB in June 2011, alleging disability as of April 30, 2010.

(Administrative Record ("AR") 119).  The Commissioner denied his application initially and

upon reconsideration.  (AR 68, 74).  Heintz requested a hearing before an Administrative Law

Judge (AR 78), and Administrative Law Judge Steven J. Neary ("the ALJ") held a hearing on

February 1, 2013, at which Heintz was represented by counsel (AR 39).  On March 4, 2013, the

ALJ issued an unfavorable decision, finding that Heintz was not disabled because he was capable

---

[1] All parties have consented to the Magistrate Judge.  (DE 16); *see* 28 U.S.C. § 636(c).

of making a successful adjustment to other work that existed in significant numbers in the national economy. (AR 34). Heintz requested the Appeals Council review the ALJ's decision (AR 16), and the Appeals Council denied Heintz's request, making the ALJ's decision the final decision of the Commissioner (AR 9).

Heintz filed a complaint with this Court on June 25, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Heintz alleges that the ALJ erred by: (1) failing to adequately consider and account for all of Heintz's impairments; (2) rejecting the opinion of a consultative examiner without providing good cause for doing so; and (3) improperly discounting Heintz's credibility. (DE 19 at 3-18).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Heintz was 42 years old and had a sixth-grade education. (AR 42). His employment history included a job as a warehouse worker, where he loaded and unloaded trucks. (AR 42-43, 176). Heintz last worked in 2010 unloading trucks for Wal-Mart Distribution, but he was fired after he hurt his back when he fell backwards on the job. (AR 42-43).

### B. Heintz's Testimony at the Hearing

At the hearing, Heintz, who was six feet two inches tall and weighed 442 pounds, testified that he lives with his wife and his 11 year-old child. (AR 42). Heintz testified that he has severe back pain all of the time. (AR 43-44). He sees a physician for his back pain and is

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 302-page administrative record necessary to the decision.

prescribed Cymbalta, Lyrica, and ibuprofen, which he says help a little bit to make the pain less "sharp." (AR 44). Heintz also complained of trouble sleeping and sleep apnea, and he said that standing, sitting, or walking for too long aggravates his back pain. (AR 45).

Heintz testified that he cannot walk a block, that he cannot stand for more than five minutes, and that he could only sit for around 10 to 15 minutes before needing to stand up. (AR 45-46). He complained of pain in his hands and right elbow and problems gripping with his hands. (AR 46, 55-56). Heintz stated that he was going back to see his doctor about his hands and elbow in a few weeks after the hearing. (AR 46, 56). Heintz testified that he could lift a glass of milk comfortably, and that he could also lift a gallon of milk, but it hurts if he turns a certain way. (AR 46-47).

Heintz reported that he spends his days mostly lying down in bed. (AR 47). He also walks around the house for a little bit, stands briefly, and lets the dog out. (AR 47). Heintz gets out of the house once in awhile, to visit family. (AR 47). Heintz stated that he tries to help with things around the house, but he really just lies down during the day, which he believes is why he has gained so much weight, 150 pounds since 2010. (AR 48).

Heintz testified that he is able to bathe himself by sitting on a bench in the shower. (AR 49). He stated that he can dress himself but cannot bend over to pick things up or tie his shoes, and his wife puts his socks on for him. (AR 49-50).

Heintz testified that when he tries to do things around the house, he overdoes it, and he has to lie down in bed for a long time to recover. (AR 50). Heintz testified that when he drives, it is for no more than five or ten minutes, since he lives just down the road from his family. (AR

50). He stated that he cooks by sitting in a chair by the stove. (AR 50). Heintz watches TV but does not really do much else for hobbies. (AR 49).

Heintz testified at the hearing that he has been helped by Vocational Rehab, but they have not found a job that he could do. (AR 51). Heintz testified that even if he had a job where he could sit or stand as he needed to relieve his pain, and where he did not have to lift anything, he still would not be able to work because he would not be able to focus due to lack of sleep. (AR 53-54). Heintz testified that he cannot sleep well due to his back pain and his sleep apnea, even though he uses a BiPAP machine. (AR 54). He stated that his medications have not helped with his pain or sleeping problems. (AR 54-55).[3]

### C. Vocational Expert's Testimony at the Hearing

A vocational expert, Marie Nicole Kieffer ("the VE"), also testified at the hearing. (AR 59). The VE, after reviewing the records in the file related to Heintz's work history, answered a hypothetical question posed by the ALJ. (AR 60-62). The ALJ asked the VE to assume a hypothetical individual who is 42 years old, with a sixth grade education and Heintz's work history, who is limited to light work but can never climb; can only occasionally balance, stoop, kneel, crouch, or crawl; cannot operate hazardous moving machinery; cannot work at unprotected heights; and cannot be exposed to concentrated fumes, odors, dust, gases, or pulmonary irritants. (AR 60-61). The VE informed the ALJ that such a hypothetical person would not be able to perform any of Heintz's past work, but there would be jobs at the light or sedentary exertional levels that such an individual could perform, including the job of cashier (2,500 regional jobs,

---

[3] Heintz's wife also testified at the hearing.

30,000 state jobs, and one million national jobs), the job of an electrical accessories assembler (200 regional jobs, 2,000 state jobs, and 100,000 national jobs), or the job of a small products assembler (2,000 regional jobs, 30,000 state jobs, and 700,000 national jobs).  (AR 61-62).  The ALJ then asked the VE to consider a hypothetical person of the same age, education, and past work experience, who had limitations consistent with the testimony presented at the hearing.  (AR 62).  The VE informed the ALJ that there would be no work for such a person, because of the necessity to switch freely between sitting and standing positions frequently, which would indicate an excessive amount of time off task.  (AR 62).

Heintz's attorney also asked the VE questions at the hearing.  Heintz's counsel asked the VE whether a 30-minute sit, five-minute stand rotation pattern would exceed the permitted amount of time off task, and the VE responded that such a pattern generally would not.  (AR 62-63).  When asked by Heintz's counsel whether, in addition to the 30-minute sit, five-minute stand rotation pattern, if an employer would also tolerate a six minute walk away from the work station each hour, the VE responded that an employer would not tolerate that accommodation because it would mean being off task more than ten percent of the workday.  (AR 63).  The VE explained that an employer will not tolerate an employee being absent two to three days per month consistently or 12 or more days per year.  (AR 63).  The VE explained that the typical break schedule consists of three breaks per day, one lasting 30 to 60 minutes for a lunch break and two breaks lasting five to 15 minutes each.  (AR 63).  The VE informed Heintz's counsel, in response to a question, that if an individual needed to lean on something during the standing portion of a sit/stand job, the need to lean would eliminate all light work and most sedentary work.  (AR 64).

*E. Summary of the Relevant Medical Evidence*

In March 2010, one month after his fall, Heintz had an MRI of his spine. (AR 222). The MRI showed mild diffuse posterior disk bulge at L1-L2, but no significant spinal stenosis or foraminal narrowing; no significant disk bulge, spinal stenosis, or foraminal narrowing at L2-L3 or at L3-L4; mild diffuse posterior disk bulge mildly extending in the caudal aspects of the neural foramen, mild effacement of the ventral thecal sac but no significant spinal stenosis, and mild left and mild-to-moderate right foraminal narrowing at L4-L5; and mild bilateral foraminal narrowing, but no significant disk bulge or spinal stenosis at L5-S1. (AR 222). The radiologist noted that Heintz had no acute bone marrow edema or fracture, but observed that there were degenerative changes at L4-L5 including bilateral foraminal narrowing, and mild degenerative changes at L1-L2 and L5-S1. (AR 222-23).

On December 7, 2010, Heintz presented to Ted Crisman, M.D., for complaints of back pain and sleeping problems. (AR 219). Dr. Crisman found that Heintz had some tenderness and a little tightness across the lumbar area, with +1 ankle edema. (AR 219). Dr. Crisman noted Heintz had not used any medications for his back pain, and diagnosed Heintz with probable sleep apnea and chronic back pain exacerbated by morbid obesity. (AR 219). Dr. Crisman encouraged Heintz to lose weight, and he set up a sleep study and blood work for Heintz. (AR 219).

Heintz underwent an overnight polysomnogram sleep study with Dr. Vicente Rodriguez on December 10, 2010. (AR 232). The sleep study report showed that Heintz slept for 412 minutes, during which he had 672 arousals, 626 of which were respiratory events and 45 of which were spontaneous. (AR 232). Heintz had 191 obstructive apneas and 532 hypopneas.

(AR 232).  Heintz's sleep efficiency was 83.9%.  (AR 232).  Dr. Rodriguez diagnosed Heintz with severe obstructive sleep apnea with low saturation and recommended that he undergo another sleep study using a CPAP machine.  (AR 232).

Heintz saw Dr. Crisman again on December 20, 2010, and Dr. Crisman reviewed the results from the first sleep study.  (AR 220).  Dr. Crisman noted that Heintz reported being told he had "relatively severe sleep apnea" and that Heintz stated he would be getting a CPAP in the near future.  (AR 220).  Dr. Crisman reviewed the MRI results as well, observing that the MRI shows moderately severe foraminal narrowing at L4-L5.  (AR 220).  Dr. Crisman reviewed Heintz's blood work results, noting that the results were "unremarkable except for elevated blood sugar," and he recommended that Heintz change his diet to correct this, so that he would not require medication.  (AR 220).  Dr. Crisman directed Heintz to use the CPAP, walk daily to help with his weight loss and back pain, and he prescribed Naprosyn and Tylenol Extra Strength to Heintz.  (AR 220).

Heintz underwent a second sleep study, a CPAP titrating polysomnogram, on December 27, 2010.  (AR 230).  During this study, Heintz slept for 440 minutes, with a sleep efficiency of 97%.  (AR 230).  During the sleep study, Heintz began using the CPAP machine, but was switched to using a BiPAP machine instead.  (AR 230).  Heintz had only 86 arousals, 47 of which were related to respiratory events, 14 of which were related to leg movements, and 25 of which were spontaneous.  (AR 230).  Heintz had 432 leg movements.  (AR 230).  Dr. Rodriguez noted that Heintz's respiratory disturbance per hour went down to 3 when using BiPAP.  (AR 230).  Dr. Rodriguez diagnosed Heintz with obstructive sleep apnea, which is relieved with

BiPAP, and he recommended that Heintz use the BiPAP while sleeping. (AR 230).

Dr. Vijay Kamineni examined Heintz on September 23, 2011, and provided a medical source statement at the request of Social Security. (AR 185-188). Dr. Kamineni examined Heintz and found him to be morbidly obese, but with a stable gait and without any problems with his head, ears, eyes, nose, or throat; no problems with his neck; no problems with his chest and lungs, as Heintz had moderate air exchange that was clear, with no crackles or wheezes, and normal chest wall expansion; no problems with his heart, which had regular rate and rhythm, without murmurs or gallops; and no problems with his abdomen, which was soft, nontender, and nondistended, with no palpable mass, and with active bowel sounds. (AR 186). Dr. Kamineni found that Heintz had no problems with his neurological systems other than the reported numbness or tingling in his hands, as he did not have any gross motor focal deficits, his remote and recent memory were intact, and his attention span was normal; that Heintz did have edema present in his extremities; and that Heintz had tenderness in the L/S spine and positive straight leg raise, although he had no muscle weakness, no muscle pains, and normal movement of joints. (AR 186). Dr. Kamineni diagnosed Heintz with obesity, obstructive sleep apnea, lumbago, and radiculopathy. (AR 186). Dr. Kamineni opined that Heintz could not sit for more than 30 minutes; could not stand for longer than five minutes; could lift 10 pounds and carry 10 pounds for short distances; could not walk for more than six minutes; had normal fine motor skills and normal handling of fine objects; had normal concentration and social interaction; had intact remote and recent memory; had normal hearing, speech, and vision; had fatigue from sleep apnea; and could not do physical activity for an extended period of time. (AR 186).

Heintz underwent an X-ray of his lumbar spine on October 11, 2011, and the X-ray showed that alignment, space height, and curvature of the spine were all normal.  (AR 204).  The X-ray showed mild marginal osteophytes, but otherwise the gross evaluation was normal.  (AR 204).

Dr. J. Sands, a state agency reviewing physician, reviewed Heintz's records on October 18, 2011, and opined that Heintz could lift 20 pounds occasionally; could lift 10 pounds frequently; could sit, stand, and walk for six hours in an eight-hour day; could push and pull without limitation; could only occasionally climb ramps and stairs; could never climb ladders, ropes, and scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; had no manipulative, visual, or communicative limitations; was required to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights; and did not have limitations on his exposure to extreme cold, extreme heat, wetness, humidity, noise, or vibration.  (AR 210-13).  Dr. Sands noted Heintz's weight, his edema and pitting, and his limited range of motion.  (AR 210).  He further noted that Heintz had reported having lower back pain, shortness of breath with exertion, difficulty sleeping, and needing help with activities of daily living.  (AR 210).  Dr. Sands opined that Dr. Kamineni's opinion was not fully supported by the entirety of the medical evidence in the record.  (AR 215).

Heintz saw Dr. Crisman for a followup appointment on December 1, 2011.  (AR 221).  Heintz reported that he could not sleep because of his back pain and because the CPAP mask was so tight it caused headaches.  (AR 221).  Dr. Crisman examined Heintz and noted that his chest was clear; his heart was regular without murmurs; his abdomen was soft and nontender; his

reflexes were 2+ and symmetric; and his leg lift was negative. (AR 221). Dr. Crisman found

that Heintz did have some tenderness and a little bit of tightness across the lumbar area, and he

repeated his previous diagnosis of chronic low back pain with some foraminal narrowing and

degenerative change. (AR 221). Dr. Crisman prescribed Feldene, Tylenol Extra-Strength, and

Tramadol to Heintz, noting that he would not prescribe narcotics to Heintz. (Tr. 221). On

December 2, 2011, Heintz called Dr. Crisman's office and reported that the Tramadol had "made

his heart feel funny," and he requested that a different medication be called in to the pharmacy.

(Tr. 221).

Heintz saw Dr. Crisman on January 6, 2012 for another followup. (AR 294). Heintz

discussed the side effects he experienced from the Tramadol, but noted that he had not had any

problems since stopping the medication. (AR 294). Heintz reported that his pain remained

unchanged in his lower back, and stated that he just wanted to get a good night's sleep. (AR

294). Dr. Crisman found that Heintz continued to have some tenderness in the lumbar region,

and he recommended that Heintz consult with a physiatrist, Dr. Thomas Lazoff. (AR 294).

On January 25, 2012, Heintz went to the Faith Community Health Clinic, complaining of

back pain, numbness and tingling in his arms and legs, inability to close his hands, and trouble

sleeping. (AR 297). He was diagnosed with bilateral sacroiliitis, carpal tunnel syndrome, and

edema to the heel. (AR 297).

On April 27, 2012, Heintz saw Dr. Lazoff, the physiatrist he had been referred to by Dr.

Crisman. (AR 270-71).Dr. Lazoff noted that Heintz had reported having chiropractic treatment,

which had not improved his condition, but had not had any injections or traditional physical

therapy. (AR 270). Heintz complained to Dr. Lazoff regarding the intermittent numbness and tingling into his legs; rated his back pain at 5/10 on a good day, 10/10 on a bad day, and 7/10 at the time of the examination. (AR 270). Dr. Lazoff noted that Heintz had degenerative changes in his low back, protrusion at L4-5 and L5-S1, and morbid obesity. (AR 270). Dr. Lazoff prescribed Neurontin and also directed Heintz to obtain physical therapy. (AR 271). Dr. Lazoff discussed injection therapy with Heintz, and noted that if there was no significant improvement, he would order a new MRI to compare to the 2010 images. (AR 271).

Heintz underwent an MRI on May 17, 2012. (AR 274). The MRI showed degenerative disc disease involving the L1-L2, L4-L5, and L5-S1 levels; no significant spinal canal stenosis; foraminal narrowing, most pronounced at the L4-L5 level; and no acute bony abnormalities. (AR 275). On June 1, 2012, Dr. Lazoff administered a caudal epidural steroid injection to Heintz. (AR 237-38). Heintz attended only one physical therapy appointment in May 2012 and was discharged in June 2012 because he did not complete the recommended treatment course. (AR 279-84). Heintz returned to Dr. Lazoff on July 12, 2012, and reported that the injection did not help with his pain and that the therapy has made him worse. (AR 258). Dr. Lazoff examined Heintz and noted that he was awake, alert, and oriented, and did not appear to be in any acute or chronic distress. (AR 258). Dr. Lazoff also indicated that Heintz had no signs of shortness of breath, and his exam was otherwise unchanged from his previous appointment. (AR 258).

Dr. Shugart provided a consultative examination of Heintz on July 24, 2012. (AR 240-42). Dr. Shugart noted that Heintz reported that his back pain was worse when he sits or stands and better when he lies down. (AR 240). After examining Heintz, Dr. Shugart found that his

reflexes in his knee and ankle were -2 but symmetric; that Heintz had no motor deficits; and that his respiration was slightly labored. (AR 240-41). Dr. Shugart reviewed Heintz's MRI results, and diagnosed Heintz with disc bulge with degeneration at L4-L5. (AR 242). Dr. Shugart did not recommend surgical intervention, because due to Heintz's morbid obesity, his risk of surgery would be significantly elevated. (AR 242). Dr. Shugart instead recommended that Heintz continue conservative care and decrease activity. (AR 242). Dr. Shugart recommended that Heintz limit his activities as tolerated within his pain. (AR 242).

On October 11, 2012, Heintz returned to Dr. Lazoff's office, but he saw a certified nurse practitioner instead of Dr. Lazoff for his appointment. (AR 250-51, 257). Heintz complained that his medications were not helping his pain, which he stated was unchanged since his previous appointment. (AR 250). Heintz rated his pain as a 7/10, and he reported that the pain causes him to wake up at night, even though he has been using the BiPAP machine and taking medication to sleep. (AR 250). Heintz did report that he was "sleeping fair," however. (AR 257). Upon examining Heintz, the certified nurse practitioner found him to be awake, alert, oriented, and capable of transitioning from sitting to standing independently with mild difficulty. (AR 250). The nurse practitioner also found Heintz to have diffuse tenderness at the L4-L5 level as well as in the bilateral sacroiliac joints. (AR 250). Additionally, the nurse practitioner noted that Heintz's pain seemed to be more myofascial pain than actual spinal pain; that Heintz's reflexes were absent at the knees and ankles; that his strength was 5/5 in his legs; and that he had a negative straight leg test. (AR 250). Heintz was prescribed Percocet and Lyrica, and he was instructed to begin physical therapy. (AR 251).

On November 8, 2012, Heintz returned to see the certified nurse practitioner in Dr. Lazoff's office. (AR 246-47). The nurse practitioner noted that Heintz reported he had not participated in physical therapy due to lesions which had been removed from his abdomen, which prevented him from reaching. (AR 246). Heintz also reported that his pain remained the same, despite the Percocet and Lyrica he was taking, and he had been having problems with blurred vision. (AR 246). The certified nurse practitioner noted that she had discussed Heintz's treatment options with Dr. Lazoff, and they had decided that since Heintz was not getting any relief from the Percocet, that there was nothing else they could offer him, so they wanted to wean him off of the Percocet and the Lyrica as well. (AR 246-47). Dr. Lazoff's office referred Heintz back to his primary care physician for further treatment. (AR 247).

On November 13, 2012, Heintz returned to his primary care provider, Dr. Crisman. (AR 291). Dr. Crisman noted that he had not sent Heintz to Dr. Lazoff for "magic pain abatement with epidural," but rather for long term pain medication, including narcotics. (AR 291). Dr. Crisman wrote that he was sending Heintz back to Dr. Lazoff with the understanding that Dr. Lazoff would provide long term pain medication adjustment. (AR 291).

On December 20, 2012, Heintz returned to Dr. Lazoff's office. (AR 243). Dr. Lazoff instructed Heintz to begin taking Lyrica again, since it did not appear to be the cause of blurred vision he had reported. (AR 243-44). Dr. Lazoff also instructed Heintz to begin physical therapy. (AR 244).

Heintz attended an outpatient physical therapy evaluation on January 3, 2013, and the physical therapist noted that Heintz had a limited range of motion in his lumbar spine, in that his

flexion was 60% of normal; his extension was 50% of normal; his sidebends were 75% of normal; and his rotation was 75% of normal.  (AR 276).

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Heintz is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

## B. The ALJ's Decision

On March 4, 2013, the ALJ issued the decision that ultimately became the

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

Commissioner's final decision. (AR 20-34). At step one, the ALJ found that Heintz had not engaged in any substantial activity since April 30, 2010, the alleged onset date. (AR 22). At step two, the ALJ found that Heintz had the following severe impairments: sleep apnea, obesity, and "lumbar degenerative." (AR 22). At step three, the ALJ found that Heintz did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 22).

Before proceeding to step four, the ALJ determined that Heintz had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except as reduced by the following. The claimant is further limited to no climbing, occasional balancing, stooping, kneeling, crouching and crawling and by no concentrated exposure to pulmonary irritants and hazards (i.e., working at unprotected heights and around hazardous moving machinery).

(AR 23).

At step four, the ALJ considered this RFC and the VE's testimony before finding that the combination of Heintz's conditions and the resulting limitations preclude him from performing his past relevant work as a warehouse worker. (AR 33). The ALJ then concluded at step five that Heintz could perform a significant number of unskilled, light work jobs in the economy, including cashier, electrical accessories assembler, or small products assembler. (AR 34). Accordingly, the ALJ determined that Heintz was not disabled from April 30, 2010, the alleged onset date, through March 4, 2013, the date of the ALJ's decision, and Heintz's claim for DIB was denied. (AR 34).

### C. The ALJ's RFC Assessment Failed to Properly Evaluate Heintz's Obesity

In challenging the Commissioner's denial of benefits, Heintz first argues that the ALJ's

RFC assessment is flawed as a matter of law because it fails to adequately account for Heintz's obesity and myofascial pain syndrome.  Heintz contends that the ALJ's analysis of his morbid obesity was "limited to two conclusory sentences" which provide a cursory analysis unsupported by any citation to medical evidence, and which ignore evidence that establishes the exacerbating effect his obesity has beyond merely postural limitations.  (DE 19 at 4).  Heintz contends that the ALJ's silence in his decision regarding how the analysis of Heintz's exertional capacity was affected by obesity was error.  Heintz cites to medical evidence in the record to support his contention that his obesity limits his exertional capacity, not just creates postural limitations, specifically Dr. Crisman's assessment that Heintz's back pain is exacerbated by morbid obesity and Dr. Kamineni's opinion that Heintz could not sit for more than 30 minutes, could not stand for more than five minutes, and could not walk for more than six minutes.  (DE 19 at 5).  Heintz further argues that his obesity's limiting effects on his exertional capacity is supported by evidence in the record which shows that his back pain interferes with his activities of daily living, as well as by Dr. Shugart's opinion that Heintz's future risk is significantly elevated due to his obesity, and his recommendations of decreased activity and conservative care.

Social Security Ruling 02-1p states that obesity is a "medically determinable impairment and remind[s] adjudicators to consider its effects when evaluating disability."  2002 WL 34686281, at *1 (Sept. 12, 2002).  It emphasizes that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id*.  It also instructs ALJs "to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC]."  *Id*.; *see generally Denton v. Astrue*, 596 F.3d 419, 423 (7th

Cir. 2010) (articulating that when assigning an RFC, an ALJ must consider the combination of all limitations on the ability to work, whether severe or non-severe); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). The Social Security Administration has indicated that obesity may cause various limitations, including "limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling[;] . . . postural functions, such as climbing, balance, stooping, and crouching[;]" as well as limitations on the ability to manipulate and the ability to tolerate extreme heat, humidity, or hazards. SSR 02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002). "Obesity itself is a condition, not a disability. It can be the cause of a disability, and it can aggravate a disability caused by something else. If . . . there are underlying impairments, then an ALJ should consider the claimant's obesity for its 'incremental effect' on the disability." *Lovelace v. Barnhart*, 187 F. App'x 639, 643 (7th Cir. 2006) (citations omitted).

Here, the ALJ found Heintz's obesity to be a severe impairment at step two, and then noted, in making the RFC determination, that Heintz's "[o]besity reasonably may limit postural limitations as acknowledged herein, sleep apnea may reasonably limit working with hazards and with ladders, et al., and some findings related to the back reasonably limit prolonged standing/walking and heavy lifting." (AR 33). The ALJ noted that Heintz had not "followed Dr. Crisman's medical recommendation to walk and lose weight and improve pain" (AR 29), but the ALJ failed to include in his discussion of Dr. Shugart's assessment that Dr. Shugart had recommended "decreased activity" in addition to "conservative care" because the risk of surgery was significantly elevated due to Heintz's morbid obesity (AR 30-31, 242). The ALJ summarized Dr. Shugart's recommendation against surgery as follows: "Dr. Shugart noted some

degenerative disc at the L4-L5 level with some bulging on the left absent any severe stenosis or disc extrusion, which were unsupportive of surgical intervention, and instead, ongoing conservative care was recommended." (AR 31). Dr. Shugart's actual plan states that, "[a]t this point, [Heintz] does not have a herniation and I would recommend just decreased activity and conservative care. Overall, his risk even with surgery because of his morbid obesity would be significantly elevated, and at this point I would not consider him a potential candidate, but I would recommend continued conservative care." (AR 242). Dr. Shugart further recommended that Heintz limit his "activities as tolerated within his pain." (AR 242). Dr. Shugart's recommendation to decrease activity was made well after Dr. Crisman's recommendation to walk to lose weight, and it occurred after Heintz's updated MRI, yet the ALJ did not discuss Dr. Shugart's recommendations regarding decreased activity due to Heintz's pain or the significant risk of surgery due to Heintz's obesity.

The ALJ glossed over Heintz's obesity throughout the decision, but the glossing over is particularly problematic in the portion of the decision where he discusses Dr. Shugart's recommendation. The ALJ mentioned Dr. Shugart's recommendation for continued conservative care, but he left out Dr. Shugart's recommendations for decreased activity, limiting activity within Heintz's pain, and the significant risk of surgery due to Heintz's obesity. These additional recommendations were located in the same paragraph and even in the same sentence as the recommendation mentioned by the ALJ, in what appears to be an instance of intentional and impermissible cherry-picking of the medical evidence in the record. *See Denton*, 596 F.3d at 425 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-

pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). The ALJ found that Heintz's obesity created postural limitations, as noted in the RFC, but the ALJ did not discuss how his obesity affected his exertional abilities. Furthermore, although the ALJ noted that "findings related to the back reasonably limit prolonged standing/walking and heavy lifting" (AR 33), the ALJ did not include any such exertional limitations stemming from his obesity in the RFC.

After finding obesity to be a severe impairment, if an ALJ thinks the claimant's obesity does not limit his exertional abilities, he needs to explain why. *Tapper v. Colvin*, No. 2:13-CV-304-RLM-JEM, 2015 WL 1486767, at *5 (N.D. Ind. Mar. 30, 2015) (citing *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012)). The ALJ should also have made clear his consideration of the impact of Heintz's obesity in combination with his sleep apnea and degenerative disc disease. *Arnett*, 676 F.3d at 593 ("An ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments.").

While the ALJ's failure to explain how he reached the conclusion that Heintz's obesity has not resulted in any exertional limitations on his ability to work could conceivably be excused as harmless error, had the ALJ indirectly taken Heintz's obesity into account by adopting limitations suggested by physicians who were aware of or discussed Heintz's obesity, it is not clear from the record that the limitations adopted by the ALJ met that standard. *See id.* The ALJ entirely discounted the opinion of Dr. Kamineni, who was aware of Heintz's obesity and who opined that Heintz could not sit for more than 30 minutes, could not stand for more than five minutes, and could not walk for more than six minutes. (AR 28; 186). While the Commissioner

argues that the ALJ relied upon the opinions of two state agency reviewing doctors who explicitly considered Heintz's obesity in forming their opinions regarding Heintz's physical limitations (DE 25 at 7 (citing AR 33)), the ALJ's decision does not mention these physicians by name, does not mention the specific exertional limitations opined by these physicians regarding Heintz's ability to lift, carry, stand, walk, and sit (AR 29, 33), and only very briefly mentioned the state agency reviewing physicians at all. Thus it is not clear from the record that the ALJ is adopting the exertional limitations opined by these state agency reviewing physicians. Furthermore, the state agency reviewing physician, Dr. Sands, completed only a check box form and provided no explanation or reasoning for his opinions regarding Heintz's impairments on limitations. *See Green v. Colvin*, No. 1:12-CV-94-JEM, 2013 WL 4647222, at *8 (N.D. Ind. Aug. 28, 2013) (citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)) ("Check-box forms are entitled to more weight when supported by medical records or when they include fully-completed narrative sections."). It is therefore not clear to what extent Dr. Sands considered Heintz's obesity in opining as to his RFC.

The Commissioner argues that the ALJ "considered the impact of Plaintiff's severe and nonsevere impairments – including his obesity – in the aggregate, and nothing suggested that he then disregarded Plaintiff's obesity when evaluating Plaintiff's work related limitations." (DE 25 at 6). However, mentioning obesity at step two or in the summary of medical evidence is not sufficient, as the ALJ should have sufficiently explained his reasons—such that the decision may be meaningfully reviewed—for finding that Heintz's RFC did not include any exertional limitations arising from his obesity, particularly where evidence in the record (including the

opinions of Dr. Shugart and Dr. Kamineni, as well as Heintz's own testimony) suggests such limitations exist relevant to obesity. *See Arnett*, 676 F.3d at 593; *see also Accurso v. Astrue*, No. 10 C 0968, 2011 WL 578849, at *5 (N.D. Ill. Feb. 9, 2011) (remanding the case to the ALJ "to review the evidence and address in requisite detail [the claimant's] limitations at step five in light of his obesity").

The Commissioner also argues that Heintz "has not pointed to any evidence the ALJ failed to consider that indicated he had additional limitations due to his obesity," and "he does not even allege that his obesity limited him in any specific way." (DE at 6). However, the Seventh Circuit Court of Appeals has made it clear that devoting several pages of a claimant's brief to arguing that the ALJ did not fully evaluate all of the claimant's impairments "is sufficient" to meet the threshold of explaining how the claimant's impairments limit the ability to work. *Arnett*, 676 F.3d at 593. Here, Heintz has argued extensively that the ALJ failed to properly consider the impact his obesity has on his ability to work, and he specifically has argued that "his obesity exacerbates chronic back pain triggered by standing, walking, and sitting and limits his *exertional* capacity as well" as his capacity to engage in postural activities. (DE 19 at 5). Thus, the Commissioner's argument, that Heintz has failed to articulate how his obesity limits his functioning and exacerbates his impairment, also fails.

For all of these reasons, the ALJ should have provided an explanation for his decision that Heintz had no exertional limitations connected to his obesity. *Arnett*, 676 F.3d at 593. I therefore remand this action to the Commissioner for further proceedings, including a more thorough review and explanation of Heintz's exertional limitations in light of his obesity.

Because I find that this case must be remanded due to the ALJ's error in considering Heintz's obesity, I need not reach the remaining issues raised by Heintz, including the ALJ's consideration of Heintz's myofascial pain syndrome, the ALJ's rejection of Dr. Kamineni's opinion, and the ALJ's assessment of Heintz's credibility.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Heintz and against the Commissioner.

SO ORDERED.

Entered this 5th day of June 2015.

S/Susan Collins_____
Susan Collins
United States Magistrate Judge